Good morning, Your Honors. May it please the Court, Andrew Love for the appellants. I would like to reserve three minutes for rebuttal. This is an appeal of a dismissal of a securities fraud case in which the district judge dismissed the complaint on falsity and Sienter grounds. And if I may, I'd like to start with Sienter and how the allegations support the core operations in this. Well, we don't have to reach Sienter if we affirm on the other issue, right? That's true. Though I think it would be more productive to start on the other issue. Okay. I'd like to start then with the risk disclosures that warranted the possibility of unsuccessful inventory management and excess inventory risks that had already materialized. And there's no dispute, the defendants do not dispute, that the disclosures were misleading because the risk had materialized. The only issue, and the one that the district court found and that is contested here, is whether or not these statements were forward-looking and whether they are protected by the safe harbor. I'm having a little trouble hearing you. Maybe you can get closer to the mic. Thank you. The issue is whether or not the inventory risk disclosures are forward-looking and therefore protected by the safe harbor. And they're just not. They were not identified in the ICC documents as forward-looking. And I've found no case in this circuit in which a statement in a 10-K or a 10-Q filing that is not identified as forward-looking in the forward-looking section. But what part of the disclosure, because what I ended up doing is I pulled out all of the disclosures, I put them in a chart, I tried to figure out what are you saying is the false data. Could you please identify that with the ER? Because I want to make sure that maybe I'm missing something. So in each of the, there are four quarters in each one. Dependents say we could have excess inventory. If we're not successful in managing our inventory, our business could be adversely affected. We may need to hold off for a long period of time, write down, sell, and lower prices with regards to this. Exactly. So they talk about that. And that they wrote down $16.8 million of inventory due to their decision to dispose of slower-moving inventory. So, I mean, they're disclosing that. Well Is that false? Yes. It's misleading. They disclosed that this happened earlier. And they are stating that this could potentially happen in the future. But there are not, what's misleading is that while they're making these statements, the risk, the current risk of excess inventory had already materialized. This is a, this is not back in 2019. And in fact, it's, that makes it even more misleading. It's like, well, we had this problem before. We had to write down inventory. We may have excess inventory in the future. But in fact, during this period of time, as the allegations are very clear, there was, the dead inventory that had been shipped down to the D.C., the distribution center, and the botched Oracle upgrade had resulted in excess inventory where So the thing that I'm struggling with about this theory, and we can talk about the Oracle statements because I think those might be a different situation, but as to the inventory, doesn't everyone know that this company always has some kind of dead inventory, that this is this fast-moving market, and so some product is always sort of going to be too old? And the question is just how much? And that's where I think you get into this sort of puffery, how could it be false if you have to say, is it too much dead inventory? Because there's always going to be some. Do you see my question? Yes. And I think it connects with the healthy and high-quality statements as well. Because each quarter, yes, the defendants are acknowledging there's rising inventory. But they keep saying, but it's healthy, it's high-quality, and And I guess that's where I'm just having trouble, because that's really kind of so mushy. I don't really see how it's not, how do we know that 5% could still be called healthy, but 10% can't be called healthy anymore? Well, in other words, why is that not just puffery? You know, yeah, it's great. Great product here. Well, first of all, they're not saying great product. They're saying in the context of questions from analysts, you know, your inventory is rising, you know, where does this inventory reside? And the response is, well, it may be rising, but it's healthy and it's high-quality. And then combined with the risk disclosure, which implies there's no excess, there's currently no excess inventory. They don't say in the risk disclosure, we have excess inventory. What they're saying is, we may have in the future excess inventory. Well, we may have excess inventory to the extent that we need to do a write-down. The write-down hasn't happened yet, so I don't know. It still kind of wears the line where it becomes a loss. Well, and, Judge Freeland, you know, it wasn't 5% or 10%. It was 30% of the inventory from Washington was dead and was sent down to the D.C. 50% of the inventory couldn't be found. There were 300 to 500 containers that were in the parking lot which couldn't   So where it is goes to the Oracle problem more, right? I don't think that has to go with whether it's dead. Then we start to get into your question about the software. Well, I think it does because it's — it can't be moved out, and so it's not salable. It's aging inventory. But I thought the district court's ultimate conclusion about a lot of — about the risk statements in particular was that the particular executives who were the defendants, it wasn't sufficiently alleged that they knew this. Exactly. And even though we're talking here about whether or not the disclosures were misleading — Well, exactly. So why was your complaint adequate as to what they knew? It's not relevant because these were not forward-looking statements. These were not identified in the SEC filings as forward-looking, which, as I said —  And they were not — Don't both have to exist, that whatever was wrong with it, they also have to know what was wrong with it? Only if it was a forward-looking statement and protected by the safe harbor. Well, they still have to be reckless, right? You still need some scienter. You still need scienter, but you don't need — and that's a scienter question, which we can — we can — happy to talk about. But in terms of — and where the judge got this wrong is these were — and he treated these as forward-looking statements, and therefore they had to have actually known. Separate from the scienter argument, the actual knowledge of the safe harbor, these were not under the definition of forward-looking projections of revenues or income. They were not plans and objectives for future operations. They were not statements of future economic performance. They were very much like, in Facebook, an alphabet. Well, insofar as they said healthy and — what was the other term? High quality. High quality. That sounds like puffery. And insofar as they — there was an implication from what they said as to the future or, you know, where — or what their risks would be in the future, that was forward-looking. That was —  Under the definition of — under the statutes forward-looking, they were not forward-looking. They were talking about risks that had already materialized. They were not identified in the SEC filings as forward-looking, and they don't fall under the PSLRA's definition of forward-looking, just like in Facebook and Alphabet, which were not forward-looking statements. Those were statements about these risks that could happen that could harm our business. And those were found misleading because they had already occurred. And again, defendants don't argue in their briefs that the excess inventory risk disclosure was misleading. They only argued it was forward-looking. It was not. Can we talk about the Oracle part? Sure. On that, it seems like — I guess I think you have a better falsity argument because it sounds like they were saying we could someday in the future have a problem with the software, and it already was a problem. Exactly. I think that's your argument. Can you explain why — so I think this bleeds back into the earlier point a little bit, but can you explain why we have the Center for that if ultimately the amount of write-down caused by this problem doesn't seem to have been so huge? So I'm just trying to understand if it was a really — I know you say it was this huge problem for the company, but it doesn't seem like it necessarily was a huge enough problem for the company, actually, for them to assume everyone knew it. Well — Or reckless. I mean, even if it's reckless. So at the end of the class period, the new leadership talked about the serious poor financial results for the quarter in the fiscal year, and they talked about the Oracle upgrade was botched, that this led to a problem of cumbersome inventory that was incredibly inefficient, that was the biggest hamstring of Funko's U.S. distribution. And what the defendants did not disclose until very late in the class period was that the running of this new state-of-the-art distribution center was dependent on Oracle. It was designed for it, and Oracle wasn't operable. And so this became a complete disaster from the get-go. And as the COO had to go down there, and as the district court found, he was aware of escalating problems with inventory. These containers that couldn't be unloaded, this aging inventory that was — Did you preserve the argument, though, that the COO's knowledge is imputed to the company? No. We did not raise that issue. But a separate issue is that his knowledge — reasonable inference that his knowledge could be inferred that the CFO and the CEO had been informed by him. They met, they talked about these projects. It's only reasonable that he took over the Oracle project. He went down to D.C. and knew what was going on there. It stretches credulity to know that he wouldn't have discussed this with them, and that — similar to in Alphabet, where the CEO of Alphabet hadn't read the certain reports, but it was inferred that the CEO, the lower CEO of Google, would have discussed that with him. So that's the inference there. And in terms of whether the healthy quality and high-quality statements are preferable or not, I think it's important to note that these were not only was — you know, these were talking about, you know, inventory, which is very important to the company, but these were in the context of questions and answers with analysts. Every single quarter, the issue of rising inventory levels came up. And the CFO Young would say, but it's okay, because this is healthy, high-quality inventory. And then the analyst would come back, you know, tell us more about this inventory and where it resides. And again, that was the response. And under Glazer and other cases where the terms which may otherwise sound like puffery, when they're — Counsel, you keep on referring to this one statement about the quality of the inventory, and I get your point that that's — perhaps you're arguing that that's your strongest example of falsity. But, you know, you are required to provide us with very specific statements that you claim are false and that they should be pled. And I'm — going back to my original question, I'm struggling to find what — perhaps that's one example that you're saying is false. What are the others? I would say the strongest ones, because the misleading aspect of them are not disputed, are the risk disclosures that state that — and imply that there's excess inventory and successful inventory management when that risk had already materialized and that the upgrade of software was a risk that had already materialized. And then the other statements are the statements by Young that the inventory was high quality and healthy, which were discussed in earnings calls and in response to questions from analysts. Thank you. May it please the Court, Kevin McDonough from Latham and Watkins on behalf of defendants at Belize. This case was properly dismissed. As the district court correctly held, the complaint fails to satisfy the PSLRA's stringent pleading requirements for both falsity and scienter. This court can affirm on either ground. I'll address falsity and then scienter, but first I want to emphasize the fundamental flaw cutting across the entire complaint, which is that there is no coherent theory of fraud. The plaintiffs' appellants admit that they have no — they've alleged no motive by either one of the individual defendants to defraud investors about two infrastructure projects that experienced setbacks, and the defendants disclosed those setbacks as they were learned. I suppose one motive could have been saving their own jobs. Well, Your Honor, they lost their jobs. Well, that's true, eventually, and that's what we're trying not to. Well, but the defendants themselves are the ones who disclosed the bad news. Eventually. And so the notion that the individual defendants were — In other words, we're talking about a period of time, and only at the very end did they disclose the bad news and get fired, but the rest of the time they may have been trying to save their jobs. Well, Your Honor, so let's start with that. On the Oracle project, the first risk disclosure that the plaintiffs complained about was in May of 2022. The very next quarter, the company updated their risk disclosure statement to say — and this is about we may experience delays with our information technology systems and software — the very next quarter, the company disclosed that, in fact, we are announcing a delay to implementation of the Oracle project. This is the one that I think is most false, because it seems like in the first quarter where they say we may have this problem, and then the next quarter they say we are having it, the allegation is they were already having it exactly the same way in the quarter where they only said may. So the allegation, Your Honor, is — and this is a problem with the complaint — there are very few particularized allegations, if any, about what the individual defendants thought, knew, or were told about any of these issues. OK, but you're not disputing falsity now. You just jumped us the answer. No, no, so certainly disputing falsity. OK, so what is the falsity about saying may have the problem where our software isn't working when it was already not working? Because the fact that we may have that problem, that is not a concrete factual assertion. That is a forward-looking statement. But it suggests that you're not having it now. Well, Your Honor, I would dispute that it suggests you're not having it now. I think the Oracle implementation was about are we going to be able to get this done by a particular time? And there's no indication that the individual defendants concluded in May that they would not be able to finish the project on time. But three months later, when that decision was made, it was communicated in real time to the investigators. But wasn't the original timeline that it would be done by May? Or June or something? That was an expectation, which, again, is a forward-looking statement. The plaintiffs have not alleged that expectation statements like that were made with actual knowledge that they were false. What the allegations are, that certain — You just jumped us the answer again. I want to stick with whether it's false. So it says — okay. I want to find the one — I think I know where you are, Your Honor. And I think that if I understand the point you're making, is if in May the company says, we may experience delays with our — with the implementation of the Oracle project, and that's a — that's a risk disclosure, which is a forward-looking statement. And because it's a forward-looking statement, in order for it to be false, the plaintiffs must allege actual knowledge of falsity, which is similar to — Okay. I think I disagree with you about that. I think you point to Alphabet and Facebook to say that. But in those cases, I read them to just say, kind of atmospherically, that people even knew that what they were saying is false. But I didn't see anywhere where a false risk disclosure needs knowledge as opposed to just regular scienter of recklessness. If it's a forward-looking statement, that actual knowledge requirement is hard-coded in the PSLRA. If it's forward-looking, but if it actually implies a false thing about the present, which is — I think — you jump back to Sienter, but the May, when the thing is already happening, I think would be false. But I guess the question, Your Honor, is what is the thing that's already happening? So in order — Well, that's what I was trying to find the statement, but I — and then you jump back to Sienter. So I think the statement was something about how our software — I need to find it. It's — we may — if we — we may experience delays in our information technology processes, and if so, that could harm our business. That's — that's essentially the risk disclosure related to information technology systems, which is not simply the Oracle project. It's a disclosure that includes cybersecurity, the company's data privacy, all sorts of technologically-related elements of the company's business.  But the failure of the information systems to perform as designed, our failure to operate them effectively, if those things happen, we're going to have a problem. I think the allegation is that was already happening. The software system was not performing as designed. So, Your Honor, we contend that the — under Wojcicki v. Tesla, the risk disclosures are forward-looking because they're conditional future-looking statements, and both — If you imply a false thing about the present, then they are not just forward-looking. You acknowledge that as a legal principle, even if you think it doesn't meet your facts? Correct. As a legal principle, but we dispute that that's the case here. Under Facebook and Alphabet — Say specifically why you dispute that that's the case here. That — that we — we contend that it is a forward-looking statement for the company to say, if something happens in the future, something else may happen in the future. Agreed that if there is an implication that it has — that there can be an implication from that that it hasn't happened yet. I think there can be, depending on the circumstances. Right, so that's what I want to know. Why, under these circumstances, is there not such an implication? Because, Your Honor, the project was still underway, and it was not established yet that the project would not be completed on time. And so, in other words, there were not issues with the functioning of the Oracle software. The issue is that it was not implemented yet. And the company's timeline, which is a statement of expectation, the company's timeline is that the project would be implemented as of the end of the second quarter of 2022 or the beginning of the third quarter. That timeline changed because the company, according to the complaint, struggled with certain elements of implementing this software, which had been — the implementation of which had been underway. So that software itself was not affecting the company's business because it was not being used yet. And that was the fundamental challenge with the Oracle software. I would point out both — Okay, let's just assume for a moment that this was false. And let's talk about where your idea is coming, that Alphabet and Facebook require knowledge as opposed to just recklessness for this kind of false present statement. I know you want to cause a future statement, but if it says something false about the present. So in Facebook, at page 950, the court says that the plaintiffs pleaded the risk disclosures in Facebook's SEC filings contradicted what Facebook knew at the time. I understand it says that, but where does it say that that's required for this type of legal theory to succeed, as opposed to just an atmospheric fact that makes everything worse? So I don't know that it makes — that Facebook or Alphabet makes a broad pronouncement that knowledge is required in these circumstances. But you're depending on them to say that it does, as a legal matter. We are, because we think that's a fair reading of both of those cases, including the Facebook majority takes on the dissent and says the point is that, in the dissent's words, Facebook knew a risk had come to fruition and chose to bury it. And I think it's — part of it is the nature of risk disclosures, which is — the purpose of them is for the company to say, there are things about our business that, as an investor, you should be aware of. There are certain risks to our business. If those risks come to pass, then there could be harm to your investment or harm to our  If the risk comes to pass, but the company has no idea that the risk has materialized — I understand that. But wait, there's the company, and there's the particular defendants. As I read the record, there were certainly people in the company who knew, with regard, for example, to the facility in Arizona, that things were a major mess. The question is whether — who knew? Exactly, Your Honor. And under the PSLRA — Whether that matters. In other words, the company isn't the question. The question is the particular people. Correct. And the individual defendants here are Mr. Perlmutter and Ms. Jung, the CEO and the CFO, respectively. And there are no particularized allegations. And this is a point that district court was spot on. When you parse the complaint, there are no particularized allegations explaining what the CEO or CFO knew about these issues. One certainly gets the impression from the whole record, and maybe this goes into the answer, that if they didn't know, they sure should have. Well, and that's essentially the plaintiff's argument, is that they must have known, should have known, but the case law in the Ninth Circuit is legion, that for securities fraud, those types of allegations are insufficient. The plaintiffs can always allege — If it needs to be knowledge. But can I go back to that? Because I think that's where you were in this answer.  You were saying that if it's just a statement about the future, it can't be a source of liability unless there's actual knowledge. I agree with you. But if we think that these statements about the Oracle software not functioning, we're actually saying something about the present. Where do we get to the idea that recklessness isn't enough? So I think it would be from our reading of Alphabet and Facebook. Well, that's the problem, though, Counselor. I went back to 950 where you identified, and it talks about the company may make a materially misleading statement when it speaks entirely of an as-yet-unrealized risk. The problem or the point is, wasn't this an actual thing that was happening at that time? So it depends on what the thing is. I think the Oracle project wasn't yet implemented. And so what happened was that the timeline got expanded beyond what was expected. And so there's no—I don't know that you could say the delay was happening as of May of 2022, because this is an ongoing project. I think the thing that was happening already was the failure of these information systems to perform as designed. And, Your Honor, the only issue I would take with that is that the Oracle project wasn't even implemented yet. But they were trying to, and the failure to operate them effectively. Hadn't they been trying at that point to use it for five months or something? No, they were trying to implement. So when they get to a point of implementation, they would shift from the existing process over to the next and then use it. But they could never get to the point where they felt it was ready to be used and they didn't want to disrupt the business in doing that. So, in other words, you would say that it didn't fail to perform as expected because it wasn't actually performing? It was never put into place, correct. In fact, the entire project was canceled as the company announced the following year. I do want to turn to Scienter. I know we've been back and forth between Falsity and Scienter, just to make a few points in my remaining time. As Your Honors know, the Scienter standard is very demanding in these cases. It requires that plaintiffs allege specific facts supporting a strong inference that each defendant acted with fraudulent intent. And mere negligence or mere recklessness is not sufficient. Can you give me your best argument? Because I think this is where you're going to have to win, if you're going to win. What is your best argument for that there wasn't even recklessness as to the relevant people's knowledge of whether the software was functioning, was performing as designed? So I would say, so there must be deliberate recklessness or intentional conduct on the part of the individual defendants. What's deliberate recklessness? Deliberate recklessness is an extreme departure from the ordinary standard of care. That's the Ninth Circuit case law. That's what recklessness is. Well, what the courts have said, including Pradenova, is that deliberate recklessness for purposes of security. Deliberate and recklessness sound like they're contradictory, like an oxymoron. Well, and I'm only, those aren't my words. I'm just using what's in the case law. I know, that's why I'm asking you, what do we think it means? So when the courts explain what, when the cases explain what deliberate recklessness means, the quote often is an extreme departure from the ordinary standards of care such that it would be obvious to the person that he or she was misleading the investing public. And here we don't have that. But if it would be obvious, then that's not recklessness. That's knowledge. And I think that's, Your Honor, the point, which is the case to say, it needs, the level of mens rea that needs to be alleged is approximating actual intent or actual knowledge, which the courts have described as deliberate recklessness. But it's, but it can't be actual knowledge. It has to be you should have known kind of knowledge. I think it might be you should have known plus, because the, what the courts have often said is, if when the plaintiffs. Something like willful blindness. Yes, when the plaintiffs allege. Okay, so let's assume it's that. So just talk about the people and how you have the idea that the people who made the statement about the failure of the information systems to prefer, that the high enough up people wouldn't have known that that was, that they were being willfully blind. So there is not, and this, as the district court pointed out, there's not a single allegation that any information was provided to those individual defendants. An allegation of fact that they knew information that contradicted the statements that they made. Even though they were having meetings with the COO, and this was a huge thing for the company, or are you saying it wasn't a huge thing for the company? I'm saying if it had been implemented, it would be an important thing for the company. But there's no indication that the COO said, we're having problems to the point that we will not be able to launch this, this software on the timeline that we expected. And that was not a guarantee. It was an expectation. Usually in these cases, we have very significant confidential witness allegations so that the court can determine, according to the plaintiffs, what did the individual defendants know and when did they know it on the key issues. And we just don't have those allegations here. On top of which, there are no allegations of insider stock sales, which is, again, a usual indicia of a securities fraud case. And so the plaintiffs have shifted to what I would consider fringe, scienter theories which do not add up to the strong and compelling inference of fraudulent intent that is required in these cases. I see that my time is up. I thank the panel very much for your time and your questions. Thank you. We have some time for rebuttal. Before I turn to scienter, I'd just like to kind of reemphasize in terms of the risk disclosures, the two on inventory and at least the May one on software. Defendants have never argued in their briefs that this was misleading. Their sole argument is that they were forward-looking and therefore actual knowledge is required. So... You're saying they did not dispute that it was misleading. That's exactly right. In terms of scienter, the plaintiffs have never argued in their briefs I think it goes closer to they must have known that under the core operations... Okay. So tell us why they must have known because you don't have a lot of time. Okay. So first of all, these were critical projects to the company's success. Second, they were hands-on management style. They admitted they were constantly focusing on inventory. Both the CEO and the CFO made those statements. So let's focus on the software. Okay. So unfortunately, the COO knew, but unfortunately for you, you didn't argue that that was enough to give it to the company. So we've got to get from the COO to someone else higher up. How do we get there? So we get... So the COO knew, the COO met biweekly steering committee leadership meetings attended by the other... by the defendants to discuss the design and implementation of Oracle. That's... And so his argument is it wasn't really so late, so they didn't really need to have told the higher up people that it was so late. What's your response? Well, the allegations are that this was a disaster from the get-go. That the implementation was a problem from... was such a problem even before the class period that the COO had to take over the project. So... And that the... And what do you think the timeline was? And could we say it was definitely already delayed by the time of the second quarter statement? The timeline is that... So the COO took it over. The DC launched in April before the DC was operable. And as a result, all this inventory was coming in there was no way to process it. And so it was piling up. It couldn't be found. But that only has to do with how late the Oracle project was. In other words, the inventory is intertwined with the Oracle project. Absolutely. Because the Oracle project was supposed to eventually take over. But the question was when was eventually? When was it supposed to take over? It was supposed to... Even Perlmutter stated in November, we launched the DC before the DC... Before the Oracle software was operable. They admitted that. That the idea was it would be operable when the DC opened. It was designed for that. And that was the timeline. So when your opposing counsel says the timeline hadn't been violated, you're saying that's not right because the timeline was start by April. Absolutely. And are you saying though that they... Did you allege that the defendants knew and that they had the intent to mislead? Is that what you're... Did you plead that? We pled that they must have known under the core operations inference. And as well as... Could you just, for a second, tell me where it says that it was April in the complaint, just so we can piece this together, what your theory is? Let's see, I have... Well, they moved into DC and it's ER 90 at paragraph 65. Let's see, the lack of... Well... Oh, I see April in paragraph 65. But also that the Oracle implementation was so problematic that the CO had to take over. And that was, I believe, even before the class period. And that's at ER 84, paragraph 48. Okay. And so then we have the problem that the COO definitely knew, but you didn't argue that the COO's knowledge is imputed to the company. So we've got to get to the CEO. And you're saying that it gets through the fact that they're having meetings. One thing that I struggled with though was that the other side said, look, the amount of money that this ended up being was $32 million out of some number of billion. Well, that's where I'd like to point the court to ER 108 and 109, which is where the new leadership discusses what an absolute disaster this was, this botched Oracle project that resulted in negative results for the entire previous year. You know, that it undermined their ability to get inventory out quickly. But okay, back to my question about the numbers though. In their answering brief, they said this is only $32 million out of some billion. And you didn't respond to that in your reply brief to say that is, you didn't say that's wrong. I mean, it seems like actually the amount of money it was out of their total revenue is actually not that big if that's the scope of the problem. It was still a monumental, the issue was whether it was big enough where they would have known. And as new leadership described, this was a monumental problem. Is the relevant number how much the Oracle project cost or how much its delay cost them? I don't think the amount of cost is less significant in terms of Cienta as opposed to how important this was to the company. It was described as the biggest hamstring to U.S. Meaning how it backed up the inventory and made the Buckeye project not feasible. So the cost of the Oracle itself is only part of the problem. It was certainly part of the problem, that $30 million write down, the inventory $30 million write down. It was described as the biggest hamstring to U.S. distribution. How do we know that in April, or I guess the statement was made, well, it was sometime in the second quarter. So how do we know that at that time in the second quarter, it was already causing such a big problem that we would say that it was already kind of causing the sort of problem that the forward-looking statement was talking about? That everyone must have known. Right. So paragraph, this is ER 9293, paragraph 70 to 73, an operations lead from the Washington warehouse talked about products being loaded without being scanned in proper paperwork. Then 50% of the inventory was misplaced. This is paragraph 75. Certainly by the end of July, 300 to 500 shipping containers of aging inventory in the parking lot. That's too late, though. We need it to be the second quarter, right? But we have, even earlier than that, we have a discussion of how Washington had maintained two years of dead inventory before it was even shipped. And 30% inventory received from the spring of 2022 from Washington was dead. That's paragraph 78. That's not because of Oracle, though, because the Oracle, or is it, is your, do you have a theory why that was because of Oracle? The theory is it's all kind of intertwined, that because Oracle wasn't working, things were already, couldn't be found. And then on top of that, it was exacerbated by- Paragraph 73 says at bottom, the fact that the warehouse had been designed to utilize Oracle, but was instead operating in Microsoft Nave, was causing major disruption. Is that tied to a time period? I don't have the- That's 93 to 94, ER 93 to 94, paragraph 73, I think. I think this is all kind of as, these are just describing as the DC was opening. So this is early. And the DC opened when, again? April. April. Any other questions or theories? If I could just point the court to just, in terms of Sienter, the Q and A between the defendants and analysts, which showed their detailed knowledge, they talked about the nuance of the inventory, and in back and forth shows that they must have known, that it would have been absurd to suggest that they didn't. And that's at paragraph 154, ER 132 to 34. There's a lot of back and forth there that shows kind of how on top of these issues they were. We have you way over your time. So thank you both sides for the helpful arguments. Can I make one quick point, Your Honor, seeing as though counsel went over? No. I think we can't do that. Thank you. Sorry. Thank you both sides for the helpful arguments. This case is submitted.
judges: BERZON, FRIEDLAND, MENDOZA